For Pace, both sides step up. Good morning, Justice. This is Thomas Stratz, D.R.A.T.H.S. on behalf of Pace. Labor Board? Your Honor, my name is Christopher Turner. I'm with the Illinois Attorney General. I'm here on behalf of the respondent of the state panel on behalf of the Illinois Attorney General. Counsel? Wayne G. Ampietra on behalf of Ursula Panacosti. Good morning, Your Honor. Very good. In terms of briefs, how many briefs are we supposed to have on this case? We have, Your Honor, my opening brief, responsive briefs by each of the appellees, and a single reply brief. Okay, very good. I'll be honest. I don't see your brief, Counsel, but we'll have it. We'll read it. I'm sure we got copies. They just weren't delivered to me, but we'll follow up on it as soon as we get done. We promise to read it before we dispose of the case. Okay. So I apologize to you. We have, usually it's 15 minutes a side. If you want to make it to 20, 10, and 10, we'll save some time for reply. But it's fairly straightforward. It's obviously a very fact-intensive case. I can assure you, I would tell you we've read the briefs. We've read the briefs I mentioned, and we've looked at the record, and so we're very familiar with them. So any time you're ready to proceed, Mr. Stratz. I am. May it please the Court, again, Your Honor, so Thomas Stratz on behalf of Pace Suburban Bus Division of the RTA. Judges, I, like you, did not try this case. And as I have tried for the last couple months to figure out what it's all about, I have struggled with a voluminous record, as I'm sure Your Honors have. But I really tried to capsulize as to what this case means, what affirmance would mean. I think there are three or four foremost issues that I would address with Your Honors. First of all, I'd sort of jump to the end of the story. Affirmance, what would it mean? It would mean that you would affirm the order of the Labor Board forcing Pace to return to employment, an employee with a very poor employment record. She was terminated twice previously. The precipitating event was in 1999. She was reinstated in 2001. But at that time she had 22 customer complaints, 10 verbal reprimands. Was it 32? I thought it was 22 complaints and then plus 10. Plus 11 written warnings, seven suspensions. A discharge in 1996, and she was reinstated with a last chance then. And then the 1999 discharge, after which there were a number of additional issues, disciplines with a common theme. They were discourtesy and confrontations with passengers, public passengers, also coworkers, and in one instance, a Glenview police officer. So what would happen if you three justices affirm the Labor Board? Pace gets her back. The Labor Board, in effect, becomes a super personnel review board. Ms. Panikowski would enjoy a lifetime no-cut contract because the seminal issue here is not going away, and that's that she was discharged in 1999 and successfully prosecuted in arbitration to be returned to work. But then let's take a step further back, though, Mr. Grass. The standard review is that they manifest worthy evidence, clearly erroneous, and we do get these cases with some frequency. I mean, frankly, not a lot, but we do have them. And we have them. In your brief, I think 28 pages of your brief are about facts, and certainly all those facts were known to the arbitrator, whoever heard these things, the ALJ, and he ruled the way he ruled. And so, I mean, we can't say because it's a terrible decision by the arbitrator, ALJ, that no rational human being would have reinstated Panikowski. And can we say that, that no rational human being, or that it's so clearly erroneous that she should be fired again? I don't think it's any rational human being. I think that's a bit of an overstatement, which I can understand is not crazy, but it is an overstatement to me. Your second statement was a little closer to what I think, and that is, was it arbitrary and capricious, and was it against the manifest way of the evidence? The facts and the deference that you would otherwise give him have been twisted and distorted by the ALJ. I mean, his ruling is internally inconsistent. And it leaves you with how could he come to the conclusion he did when he finds, for instance, that Pace's managers acted reasonably in at least a couple instances of discipline, including the precipitating event where Ms. Panikowski confronted an Asian passenger and was corroborated not only by two independent passenger witnesses, and yet he found a way to harmonize. And I think you see a pattern, Mr. Justice Quinn, in particular that when a particular witness is adverse to Pace, Judge Clifford gave him credit. In many instances of that same witness, to the extent adverse to Ms. Panikowski, he discredited them. That's what finders of fact do. Every day, we sit up here, roughly half our cases are criminal, and you can imagine in every single criminal case there would be an allegation, well, the trial court should not have believed those police officers, you should have believed my client. And we never, never, I've been here 14 years, have ever said that. We've never gone along with the idea of the person trying the case was wrong in the facts. I mean, I've never seen it. To look at finity, so again, how I think the parameters, how this stuff looks, if the record contains evidence to support the agency's decision, it should be affirmed, citing Abrahamson in Illinois Supreme Court case. It would appear that the substantial evidence standard is not nearly as exacting a standard as the manifest weight standard. It's also been explained that because the weight of evidence and the credibility of the witnesses are uniquely within the province of the agency, there need only be some competent evidence in the record to support its findings. An administrative agency's findings and conclusions on questions of fact are deemed to be prima facie true and correct. So your whole case, it seems to me, Counsel, would involve us saying the ALJ is wrong in the facts. The ALJ is inconsistent on facts related to the same witnesses, and therefore if he ignores or is clearly erroneous, ignores sworn testimony, or is clearly erroneous, you don't have to defer to the agency below. Otherwise, why have an appeal? And the effects of this are dramatic, as I was saying. Any person who wins an arbitration has a lifetime contract unless Pace fires the managers that tried to fire her or him because as long as they're still around, there is many references in the record that the same managers are still there. That's because they're still there, and that's their job. And I know that Your Honors would not seek to make the Labor Board a personnel review board for Pace. So we have a lifetime contract. We have no ability to ever terminate Ms. Panikoski. Well, you should know, Counsel, how this works is on the Epelon side or Eppley side, it's always Armageddon. The world, as we know, will be destroyed if you find for my opponent. We hear this every day, especially in insurance cases, surprisingly enough. And that generally won't wash. I agree. What I noticed you didn't bring up in your brief is the idea of public policy, the classic DCFS cases where children were tortured to death, died, DCFS employees still reported them as being fine. So public policy took a hand. So to your great credit that you don't bring that up. But it's a really tough road to hoe. It really is. It's a horrific personnel file. We accept the challenge, Judge, because, again, we're standing here 11 years later, and what Judge Clifford did is destroy a statute of limitations. And, again, he went to facts. And you're correct, Your Honor, that it's a fact case. But he goes to facts because we use them in progressive discipline that he could go back to a seminal event four years prior to her most recent termination and drag everything forward. And that would destroy the statute of limitations. We have no statutory impingement on our right to review a personnel file going back forever. In some cases, there are contractual deals that limit us. But that's not in this record. And so we went back and reviewed it. And one of the Brett Henry's here, he says we terminated it for an entire record. We terminated it for a specific incident corroborated by independent witnesses and her overall record, which means we looked at it. And we looked at it, and, by the way, in the record, there are commendations in there. There are citizens who said she did a great job. She helped me out. I was lost. We considered those, too. And Judge Clifford was actually examining one of our witnesses. Did you rely on it? And he said, I reviewed it. Rick Foster, he became an advocate almost in going after Mr. Foster, who, I mean, there are just issues that he glommed onto that had nothing to do with it. Who wrote the last chance agreement? Who wrote the termination letter? Who made the ultimate decision? Why those? There are no shifting explanations, and that's where he came legally to his conclusion that we were bad guys. And, Your Honors, in the very opening couple pages of his recommended decision order, Judge Clifford tells us why he believes he can sort of help out Ms. Panikowski. He said that she was particularly vulnerable to the bad acts of employers and their agents. He is the only person in this case that demonstrates any sort of animus, and his animus is against the employer. So he takes all the facts, Justices, and he crams them into that preconception that she was vulnerable. That comes out of whole cloth. There's no record of that. Do you get to pick the ALJs? Is this like an arbitration where one side gets to pick somebody? We do not have any striking authority. I expect it's not like an arbitration at all. All right. Darn. Actually, I've had many cases with Judge Clifford. Here he lost his way. I'm sorry. He lost his way because he has made up the law. There's not a single case that says you can take a statute of limitations and ignore it six years, seven years, four years, five years later, relative to 11 years. According to the briefs, both say that she was still fighting over her perceived shortage in overtime or whatever it was through December of 2004 when she gets fired in February of 2005. Is that right? Part of that is correct. In her mind, Judge Clifford found that when she gave a general release related to all issues, somehow in her mind retained the ability to still raise that. That's a leap of faith into the mind of Ms. Panikowski that is not proper. The record is she gave a release. The record is, by stipulation, there was one written demand related to that back pay in 2002. He says again out of whole cloth that antecedent events should not even be considered. We don't have to even answer them as an employer.  It's a fundamental. And then he says here, for whatever reasons, it shouldn't be enforced with its usual rigor. His word, his law, totally out of thin air. He concluded that there was no pattern of disparate treatment against protected union activities or concerted activity related to the handling of complaints. One of the precipitating complaints that would be in issues was a complaint by what he continually refers to as an Asian gentleman named George Wang. The board found there was no union animus. Let's go back to Wang, though. Wang is a male content, is he not? Frankly, to be polite about it, he's made numerous complaints against many PACE employees, and then suddenly he's given credence when he's attacking Ms. Panikowski. I don't believe, Justice Quinn, that the record shows complaints against others. It shows the hearsay, somewhat hearsay testimony of Michael Lacey, that he got along with him but others didn't, and somewhat Ms. Panikowski testifying about how this guy was a pain to everybody. The point is Lacey said he could get along with him. ALJ Clifford credits Lacey there but discredits him later when Lacey says there was this huge investigation of Wang, later admitting he was on vacation, passed by the terminal once, saw two supervisors. Somewhere this becomes six or seven supervisors, totally out of thin air in all the briefs. There's no six or seven testified by Lacey. Was Wang an individual who filed complaints all the time against bus drivers? No. Wang would complain to the drivers on the site because apparently there were three routes, Justice Steele, and he could take almost all three because before they split into different directions, his stop would be available. So he was looking for the first one out, and so he'd say, are you leaving first or is he leaving first or is she leaving first? Hey, it's a service business. It's a customer business. And he came in and he testified, and he was corroborated by two independent people, not PACE employees, who said that she got out of her seat and menacingly approached Mr. Wang and began yelling at him. And Judge Clifford said he agreed. He credited those independent witnesses, and he credited Wang. You can be a pain in the behind, excuse my German, but you don't have any exposure you shouldn't to a discourteous and screaming PACE bus operator. Again, Judge Clifford and Judge Quinn, you talked about the facts. He says that he finds in the abstract, in the abstract, whatever that means, that Ms. Panikowsky is in need of special protection, and she's in particular need of union. She had her union all the way along here. I mean, that's maybe a little bit lost, and I know labor law isn't something that is always in front of circuit courts or even the appellate court here. She had the union, and the union withdrew certain grievances, and in one of his most amazing leaps, a union supported her in a grievance. They went and investigated it with PACE managers and withdrew the grievance, saying she had been not only treated fairly, but that PACE had acted appropriately, and Judge Clifford used that against us, saying we should have continued to investigate it, which is similar to his view of the 1999 incident. We lost in arbitration. We still have to keep investigating that, and again, their whole setup of disparate treatment misses the mark. Disparate treatment in a union setting, bargain floor setting, means non-bargain floor people were treated better. Gina Barsano, who is the sister of James Barsano, is a bargain floor person. The other bus operators who testified against her in at least one of the incidents is a bargain floor person. How that can turn into the leap that he's made, that we are anti-union or anti-conservative activity. Again, the finding here, though, is that it did not involve protected activity, not the conservative activity that the federal cases talk about, not anti-union animus, but rather that she was involved in protected activity, the filing of the complaint in 1999, the arbitration, and that's why he ascribes bad motives to PACE based on protected activity, not on conservative activity. Okay, protected activity, but under the same type of analysis by their own, the board's own statements, counsel's own statements. You need the 10A1 versus the 10A2. Red herring, because the cases they said, FOP is one, talk about animus, and he found no animus. And the board said there was no animus, and if she had a 10A2 case, it would have been fatal. So they're all over the place. It's a moving target, as I suggested. And he comes to the conclusion, gentlemen, that we've offered shifting explanations for things, and that's really where he just plows through everything else, because Mr. Foster didn't say he made the decision to terminate, or that Brett Burkhardt did or didn't, that there was two versions of the last chance agreement, which is mercy in a capital case, basically, in employment law. Made a big deal about how there were two versions, but there's a stipulation that the versions were identical except for some formatting. But Judge Clifford went to who prepared it. There was shifting explanations of who prepared it. Who cares who prepared it? She was given a chance to have her job back. He also makes a blatant misstatement of the record by saying that the decision to terminate her was not final until she rejected the last chance agreement. Absolutely wrong. She was terminated. Her union came to Pace and said, can we get her back? And Pace gave her the chance. And she said no, because she figured they would use the last chance agreement against her. That's rational, isn't it, since they fired her in the past? Well, you know, we're jumping into the mind. We're jumping into the mind. You are, but the motive in 10A1, 10A2 is the core, and motive is a fact issue. And so when the ALJ reaches motive, he has to reach it. Her whole case depends on bad motive. But he has to go back to 1999 to the seminal event, and that's crazy. When does it end? It never ends, Justice Quinn, does it? It goes on forever. And now that she's once won an arbitration, we can never fire her, because these things aren't going away. And now that we have an elastic statute of limitations, we come back 10 years from now. You guys may still be here. No, I won't. You have a better plan than I. But, you know, it's crazy to make law out of thin air. What's in the mind of her, what's reasonable, and attributing bad motive on facts that are wrong? He finds that Pace managers acted appropriately in the Wank case and in the confrontation with the other driver in the near accident in Golf Mill Parking Lot. And it was a bargain for a Pace employee that testified against her, Mr. Geary, who gave reports against her. He goes to the lengths of saying that because Mr. Barzano called the Glendale police officer in the accident case, that renders everything the police officer said menacing and specially solicited. And how about in his opinion, gentlemen, where he repeatedly says, I find this is a confidence-building fact. Well, how often do you have employers going out and talking to police officers and saying, would you please make a complaint against our employee? Now, again, Pace is a public employer, so I imagine you would see it more there than you would with a private employer, but that's not all that common. We're criticized for not investigating certain things, and now we're criticized because we did. She volunteered at the scene to a different supervisor that what had been a simple situation was exacerbated by the confrontational attitude of Ms. Panikowska. She found it unusual. That person came back, and that person, by the way, wasn't around in 1999. That's clear in the record. Anyway, Mr. Barzano followed up and said, officer, and it's a big deal, who called whom? Come on. She wrote the letter. Pretty nifty letter. And he says it's menacing, and there's all this subliminal threat, and come on. She said that it was a simple deal, should have been over with, and Ms. Panikowska made it a big deal. Now, whether or not there was a Glenview lawyer, village attorney in the room during the trial, so what? She is a police officer for 20 years. She resided in there. She found this so unusual, and yet to use this against us. She found it so unusual that she wrote that letter. Yes, they asked her for it, just like any other report, but they can't make her give a report. So she gives a report. Why don't you wrap it up, and we'll give you some time for reply. All right. The facts, it is a fact-intensive case, but he missed, ALJ Clifford missed the boat, went off on a frolicking detour, and it is not a record that you should sustain. You cannot sustain his ruling based on the palpable error. Thank you, counsel. One more question. Yes. The accident review board has four members on it. Is that correct? Yes, Justice Steele. And two of those members who are supervisors were also the supervisors who were involved in the 1999 incident. Do the accident review board, when you're sitting on that panel, since they knew, since they had a lot of background history on her, would they ever recuse themselves and say, we can't handle this? No, but what's important about that, Justice Steele, is there were two other members who were bargain for bus operators, her fellow union persons. At least one of them voted with the two managers. If they retained it, even assuming they were, it still took at least the vote of one of her fellow union members who were anonymous, or there wouldn't have been an affirmation of the finding of preventable. Now, Judge Clifford on that point said there's not a shred of evidence as to why it would have been found preventable. Again, the big, bad employer fixing the case, bringing in the same guys with all this preconceived notions. Two of her fellow employees, also members of the union. Thank you. Thank you. Good morning, Your Honor. Wayne J. Ampietra on behalf of Ursula Panikowsky. Pace seems to think that whatever it says is the gospel truth, but the record shows that whenever some outside agency was called upon to determine whether Pace had acted properly or not, Pace always was found to have acted wrongfully. And that was two out of two? Two out of two. In fact, in the prior arbitration, where Ms. Panikowsky was returned to work, the finding was that the sister of one of the supervisors was the one that had damaged the bus that Ms. Panikowsky was accused of having damaged. Everybody knew she didn't do it, but Pace tried to fire her on what was clearly trumped up false accusations. That's what... How about the seven suspensions and the 22 complaints and the ten other written things, were those all trumped up too? Well, what the record shows is every time Ursula Panikowsky did something, people at Pace disciplined her for it. This is what Pace stipulated prior to the hearing were the issues, among the issues to be decided in this case. On October 7, 2002, Pace filed a complaint against Ursula Panikowsky because she rolled up the sleeve on her uniform. On October 28, 2002, they filed a complaint against Ursula because she didn't answer a radio call quick enough. On June 16, 2003, Respondent, that is Pace, filed a complaint against Ms. Pace for wearing sandals in the driver's room, not in the bus, but in the driver's room. These are the kinds of complaints and incidents and discipline against Ursula Panikowsky. The most minute, almost, if it wasn't so serious, would almost be laughable kinds of accusations against her. And it's clear, as Hearing Officer Clifford here found, that this was a continuing campaign by Pace to build up a file against Ms. Panikowsky because she didn't go along with the program. Whenever somebody at Pace did something to her that was in violation of her rights, she filed a grievance. They didn't like that. And that's what this is all about. And that's what Hearing Officer Clifford found, was that she was treated totally differently than anybody else. You want to talk about the incident in Glenview where the truck hit her mirror? The police officer on the scene who was there saw the vehicles, said, I can't tell how this accident happened or who caused it or what happened. Yet Pace, after conducting no investigation whatsoever, decides it's a preventable accident. And they say to the police officer, by the way, we'd like you to write us a letter complaining about Ursula. We introduced a witness who was on the bus who said that it was the police officer who was out of line and who wasn't acting properly. But Pace never, they knew about this person. They never even bothered to talk to her. The issue of you can't go back and use these, quote, old incidents as part of what's going on. First of all, Pace stipulated that these were issues in the case. Tell me about the stipulation. I have it in my hand. Where would you suggest that that was an issue if it stipulated facts? No, these are stipulated contested issues to be decided in the hearing. Well, that's not a stipulation. That's a stipulation that's an issue. Right. And they stipulated that these incidents, these things that Pace now says we can't be talking about, these were contested issues in the case. And when this evidence was introduced about things that had happened more than six months prior to Ms. Panikowski's discharge, they never objected. They allowed that evidence to go in without objection. They waived that argument. Is that a case for that? You probably do. Go ahead. Indeed. The argument from Pace devolves now to saying, well, the hearing officer apparently had some grudge against Pace. I mean, that's what I heard counsel say not more than three minutes ago, that the hearing officer had this bias against employers. Well, there's absolutely nothing whatsoever to support that assertion. Pace just can't stand it that the hearing officer, in essence, has said, there are people lying. They didn't tell the truth. And that's what the hearing officer's job is to do, is to decide when there are conflicting versions of what happened, as there were here, who's telling the truth. Counsel says, well, this thing with Mr. Wang, it was corroborated by two witnesses. That's not true. There was only one other witness who was called. They had some hearsay statement from somebody else who never appeared, and we have no idea who he was or where he was. That's not admissible, and they can't use that to support it. But this woman who did come and testify, number one said she didn't hear anything that Ursula said, so she doesn't know what she was saying. Number two, she admitted that before she walked into the hearing room to testify, she and Wang got together and discussed their testimony outside the hearing room. Now, if that's not a reason to distrust her testimony. It's done every day, unless there's a motion to exclude witnesses. There was. Before, where the witnesses are instructed to don't speak to another. There were. They were instructed not to discuss their testimony with anybody, but they did it anyway. Right. And that's a reason to disbelieve her testimony. And the evidence is, the record is replete with evidence that this fellow, Wang, was constantly complaining about everybody all the time. He wanted to know which bus was supposed to leave first. That's ridiculous. Right there is posted the schedule, and the schedule says what bus leaves when, and that's what they do. In fact, the record shows that he complained that Ursula left too late. Pace's own record showed that was a false accusation. She left on that occasion where Wang complained about her absolutely on time. The man was a proven liar. There is more than enough evidence for the ALJ to distrust and reject his testimony. The ALJ commented that the supervisors in the 2005 firing were the same supervisors in the 1999. Did he not? Yes. And that's true. How is that supposed to work? So you have an arbitration you win in 2002 or whenever it was. Are those supervisors forever barred from supervising Ms. Panikowski? No. Pace has gotten more and more. Every time they write him up, are we to presume that they're liars because they have animus against Ms. Panikowski? No. That's what Mr. Griffith seems like. Well, that's what he says. That is what he said. That is exactly what he said. Well, first of all, it's real simple. Pace has got more than one garage and one place out of which drivers work. They could have transferred Ms. Panikowski to another place. And she wouldn't have complained? Is that what you're suggesting? Well, I don't know. That if they transferred her, she would not complain? Well, she certainly would not have been subject to the same people who have been harassing her for years and they put her back where they can do it to her again. That would have sounded like a solution to me back in 1999 or 2002 when she got reinstated. You know what? I really shouldn't work with these guys. That's what they should have done. Okay. Maybe she should mention that next time she reports for work. Well, you know, Pace is the one that makes these decisions. They can't ask for a transfer? She's been a senior employee. I mean, a lot of it's off time, but she's there. She got credit for it, right? So she couldn't ask to be transferred away from these guys. Why is it her obligation to ask for a transfer? You brought it up, not me. You said that she could be transferred. Oh, okay. Well, no, no. Good idea. The hearing officer found that they put her back in front of the same people who had made false allegations against her before. Okay. Found by a different hearing officer. I don't see why that's invalid or inaccurate or not allowed by the law. I'm not saying it's not allowed by the law. Well, but that's what their argument is, is he can't do that because it happened too long ago. But as all the cases, both we and the Labor Board have cited, these incidents from the past, which, of course, Pace stipulated would be heard in the case, are always admissible as background to show what the relationship between the parties was. And Pace said, they try to get around it now, we fired her for everything that was in her record, because she had a bad record, without specifying anything. It sounds like she had a horrific record. Well, that's what they say. I don't know. I mean, seven suspensions, all these write-ups. But that's Pace's action. That's part of building a file against somebody. Well, the question would be are they in the file or not. If they're in the file and she didn't win a grievance on them, then they're in the file. It would only make sense to me that an employer would consider seven suspensions when he has somebody up to determine it. Except that the document they claimed that the district supervisor claimed to rely upon for his decision to fire her, this summary of her record, just mysteriously disappeared. What he says he relied on no longer exists. It wasn't introduced at the hearing. They didn't have any idea, Pace, what happened to this document. So the, quote, evidence that was the basis for her claim just isn't there. And all we have is Pace getting up and saying she had all these suspensions. But that's, there's no record, there's no document in the record that shows all this. They get up and say it, and you're supposed to take this at face value. It's just more of the same stuff that two hearing officers found was not trustworthy. You have two minutes. The standard is clear, and I think counsel will talk about it some more, that to find that there was an unfair labor practice here, which is what was being done by the hearing officer, is that Ms. Panakoski engaged in a protected activity. And her protected activity wasn't just filing the prior grievance that had her reinstated. It was her continuing complaint and filing other grievances throughout this entire period of time, including the fact that they hadn't complied with the first award. So there's no question that she was engaged in protected activity by filing grievances again and again and again. That Pace knew of it. Obviously, they did. That's really not contested. And that they discharged her because of her participation in the protected activity. And Pace said, well, we never said we were retaliating against her, therefore there's no evidence that we retaliated. We had some other reason or something, except that the law is that you can look at the actions of a party, and if those actions and the reasons for their actions don't match up, that's evidence of wrongful intent. The record is replete with that evidence. The hearing officer found that there is no way that it can be said that that's against the manifest way of the law. Thank you, Counsel. Thank you, Counsel. You're welcome. ILRB.  May it please the Court. I'm Christopher Turner. I'm here on behalf of the State Panel of the Illinois Labor Relations Board. I'd like to discuss two of the issues that Counsel for Pace raised, his efforts to get around the onerous standard of review that they faced, the manifest way of evidence standard. One was that they challenged the Board's decision based on the fact that the Board never found that Pace's decision to fire Panikowsky was motivated by anti-union animus. And the second one is that the Board improperly relied upon pre-limitations period evidence and events in support of its finding. Now, the Board did not err on either of these points. First of all, Section 10A1 of the Act did not require the Board to find any anti-union animus, as long as Ms. Panikowsky had proven that she was fired as a result of her engaging in protected activity under the Act. That was her grievance. And number two, the Act does not preclude the Board from considering Pace's conduct or any other events that occur prior to the limitations period in order to determine Pace's motive in later firing Panikowsky during the limitations period. Now, first of all, this case, this unfair labor charge is not about anti-union animus. It's about Panikowsky's protected activity and the fact that Pace fired her in retaliation for that activity. Section 10A1 of the Act does not require any proof of anti-union animus. It only requires proof of the causal link it needs. And this is what the Board finds, is that the employer fired the employee as a result of their protected activity. That's fundamentally causation language. And that's exactly what the Board and Judge Clifford found. Now, in order to claim that anti-union animus was required, Pace conflates Section 10A1 and Section 10A2 of the Act. However, these two subsections provide alternative statutory bases to find an unfair labor charge. Section 10A2, which is not at issue here, and the claim was not brought under Section 10A2, prohibits any employer from firing, hiring, or any tenure decisions based on union membership or union activity. Section 10A1 of the Act, that's the claim that this charge was brought under where the violation was found, provides a broader protection. It prohibits any employment actions that interfere with, restrain, or coerce an employee as a result of their protected activity under the Act. Now, often you will see derivative actions. That is, any time you have a violation of Section 10A2, it's almost always going to also be a violation of Section 10A1. That's because union activity is protected activity under the Act. But 10A1 provides this broader protection for other protected activity, and that would include filing, pursuing a grievance, and particularly, of course, pursuing a grievance to an award in a successful conclusion. And Pace has not denied that her grievance, the 1999 grievance, culminating in the September 2001 award, was protected activity. They stipulated it to that fact below. Therefore, once Panikowsky proved that her discharge was as a result of that protected activity, she didn't need any additional proof of anti-union animus. Now, both the Illinois and federal authorities support this reading of the Act. In City of Burbank v. ILRB, the Illinois Supreme Court explained that where an employee asserts a discharge for engaging in protected activity, quote, the charging party must first show that the adverse employment action was based in whole or in part on anti-union animus, or the employee's protected conduct was a substantial or motivating factor in the adverse action. It uses the language or. They're expressly recognizing alternative bases in order to find a violation of Section 10A1. Now, also addressing an analogous provision in the federal Act, the National Labor Relations Act, the United States Supreme Court recognized that that federal act protects employees from retaliatory discharge for their good faith pursuit of a grievance, regardless of whether there's any union involvement and regardless of whether there's any union purpose in the grievance. In that decision, NLRB v. City Disposal Systems, Inc., which is cited in the briefs, they addressed a claim by a trucker under Section 8A1 of the federal act, and that's the analogous provision in the federal act to Section 10A1 in the Illinois Act. It was a claim that he was discharged for filing a grievance under the collective bargaining agreement. However, the union had refused to assist him, and furthermore, it actually expressly found that his grievance had no merit. However, on the appeal, both Supreme Courts found that the grievance was still protected activity under the federal act for purposes of his claim under Section 8A1, regardless of that union involvement, and more importantly, regardless of whether or not his grievance was totally selfish in motivation and didn't serve any of the interests of the union. That didn't matter. What was critical was, was he fired for that grievance and pursuing that grievance in good faith. And what's the name of that case? I'm sorry. NLRB v. City Disposal Systems, Inc. Would you like the citation? No, it's fine. Okay. Now, none of PACE's quotations in their cited precedent actually address any kind of claim that finds that just where an employee has proven that they were discharged or had some other adverse action as a result of protected activity, that they are required to further show anti-union animus. All the quotations they cite, all those cases, are cases which involve the derivative actions are all sometimes called hybrid actions that I discussed. That is, that usually when someone brings a claim claiming that they were fired or had some other sort of adverse action against them for their union activity, they will bring their claim under both sections. And it's called derivative because the 10A1 violation is derivative of the 10A2 violation. And that was in the city of Burbank. I think the case involved the employee claimed that they were fired for their union organizing. And all the federal cases all involve claims that the employee was fired for union organizing or some other kind of union activity. Therefore, when they're going over the analysis about what was proven and what kind of circumstantial evidence is necessary, they talk about it in terms of anti-union animus. That's because the question you're looking at, was the decision to fire motivated by their union activity or their union membership? And in the city of Burbank, the Supreme Court specifically said, we do not attribute any anti-union animus to the city, right? Yes, that's correct. Now, the PACE further challenges the Board's decision by arguing that the Board improperly considered PACE's conduct or other events before the Act's six-month statute of limitations period. And this argument fails for three reasons. First of all, the Board did not rely solely on pre-period events in order to find discriminatory motive. They also relied upon PACE's disparate treatment of Panikowski in its unusual and inordinate investigation in February of 2005, which happened in the weeks prior to the discharge. They also relied on PACE's shifting and their manufactured explanations, which were given after they discharged her. These were all events within the limitations period. Now, to the extent that the Board relied on pre-period events, PACE actually established the relevance and importance of these events to the decision to discharge by preferring or offering them as their reasons for the discharge. PACE in particular complains that the Board relied upon its findings of a disparate treatment and a sham investigation that took place in the July 2004 Gulf Mill incident. It's also called the Glenview incident, where there was an accident bending the mirror on the bus in July of 2004. That occurred about a year before the charge with Panikowski filed her charge. However, it was PACE that put this incident into issue and relied on this issue, saying that it was one of the reasons it relied upon in its decision to fire Panikowski. As counsel pointed out, PACE never objected to the introduction of this evidence, whether in its answer to the charge, in its pre-hearing memorandum, even in its post-hearing memorandum. In its pre-hearing memorandum, it listed all sorts of events which involved various incidents and events which occurred prior to the six-month limitations period. However, while it offered these events, it did not in any way raise any objection or say that it was improper to consider such events, and that's because they viewed it as relevant. PACE wants to be able to come forward and have employers rely upon pre-period events in order to discharge someone, and then insulate those events from any kind of meaningful review under the statute of limitations. Well, that brings us to the final reasons that Section 11 of the Act, the statute of limitations provision of the Act, does not prohibit Panikowski or any other employee from using pre-limitation period conduct or events in order to show that the motive, the employer's motive in discharging them later in a discrete act during the limitations period was illegal. It is a statute of limitations. It is not an evidentiary rule. Now, applying an analogous provision in the Federal Act and the National Labor Relations Act, the Supreme Court in Local Lodge No. 1424 v. NLRB, there it held and recognized that the Federal Act's limitations, statute of limitations, ordinarily doesn't bar such evidentiary use of anterior events. Those are events occurring before the limitations period. Now, the holding in the case did actually bar a claim. It was a claim against the union for its enforcement of what was a facially legal, everyone admitted it was a facially legal collective bargaining agreement. And the claim was that that enforcement of the collective bargaining agreement constituted an unfair labor practice under the Federal Act solely because prior to the limitations period, its execution, that is the original execution of the agreement, had violated the Act. The Court, there was no claim of intentional or any discrete act of discrimination occurring during the limitations period. It was just essentially an operation of law saying this is an illegal effect of a prior illegal act. The prior act was the execution, the improper execution of the agreement. However, they never challenged it back then, but they later tried to, sorry, the plaintiffs later tried to challenge the enforcement of the Act well after the limitations period had run. Since Local Lodge, other federal courts have reaffirmed that the National Labor Relations Board, that's the federal board, can rely upon pre-period events to prove that an employer's timely challenge conduct was illegally motivated. And we cite to these cases in our brief some examples of these cases in the brief. There's SCA, Tissue North America LLC versus National Labor Relations Board. They're the Seventh Circuit affirmed a finding of a violation for retaliatory discharge under the Federal Act. And it's specifically held that the board could rely on an employer's pre-period conduct in order to prove that its later discharge was motivated by, in that case, it was anti-union animus because union activity was at the heart of the case. Also, we cite RICO Inc., R-I-K-A-L, versus NLRB, were the First Circuit, similarly, affirmed a finding that the employer had discharged an employee for her union activity. And it specifically rejected the same defense, the statute of limitations defense, that Pace tries to raise here where they assert that the employee could not rely on the employer's pre-period conduct to establish illegal motive. In Illinois, the Illinois Appellate Court in Moore versus Illinois Labor Relations Board recognized that Section 11 of the Act does not bar the use of pre-period events to prove that a later discrete act during the limitations period was illegal under the Act. That decision addressed an employee's claim against the union, not against the lawyer, for a breach of the union's duty of representation in the handling and prosecution of the employee's grievances. How about two minutes, counsel? Okay. Got it. And that could, like Locolaj in that case, had barred a claim that occurred, this one's a claim that occurred during the, I'm sorry, prior to the limitations period. But it also recognized in reaching that holding that the employee could rely on the same conduct, alleged misconduct of the union that happened pre-period, that it couldn't challenge in its own action to support his other actions because he also had challenged their actions like a failure to take the grievance to appeal that occurred within the limitations period. And the Court specifically said at page 336 that those allegations could be used as evidence to shed light on the allegations alleging the breach of the duty of fair representation by the failure to process Moore's grievance. Otherwise, the plaintiff relies, sorry, Pace relies upon various Title VII cases, which if you will look, they will also support our reading, like Locolaj, of this dichotomy. They do not involve cases where you have a discreet act for intentional discrimination during the limitations period. Here, Panikowsky alleged an independent retaliatory act, her February 2005 discharge that occurred within the limitations period. Therefore, there was nothing inappropriate about the Board and the Administrative Law Judge considering the pre-period conduct, conduct from incidences that Pace had put at issue by raising them as justifications for the discharge. In order to determine whether Pace's motivation in firing Panikowsky was improper. Accordingly, we ask the Court to affirm the Board's decision finding that Pace violated Section 10A1 of the Act. Thank you, Mr. Turner. Mr. Dressen. Very briefly. I understand. I'll just first respond to Mr. Gianpetro. He said they built a file. There was a synopsis that disappeared. You know, we have to build a file because we're challenged in arbitrations and we need to prove aggravation. Mr. Gianpetro said the synopsis was lost, but they've embraced the Perkovich Award. And the record in the Perkovich Award shows all those disciplines that Your Honor, Justice Quinn mentioned. So there is something in the record contrary to what he said. There is not a single grievance by Ms. Panikowsky that was sustained or even taken into arbitration. Yet they're saying our motive was to fire her for filing grievances. She didn't win them. She didn't even go to arbitration on them. Maybe she should have brought the union in here, but she didn't. It is true that in the original Wang incident, Pace found she didn't leave late. She, without even being told specifically it was Mr. Wang, then went and confronted him. She got no discipline for the first one. It's another red herring, gentlemen. She accosted him on the bus, got out of her chair, went and yelled at him. The NLRB case quoted by counsel for the board, disposal systems, was a territory discharge case for good faith exercise of agreement. That's not what this is all about. It was because a complaint by Mr. Wang was sustained. It was independently corroborated, and so found Judge Clifford. It is interesting that counsel for the labor board talks about precedent. There isn't a single case in this record where the trier went back three and a half plus years, over three years beyond a six-month statute of limitations, which is jurisdictional and they've admitted as much. There's a very large misconstruction, misapprehension of one set of facts, and I want to make it very clear. Counsel said that we didn't object to the introduction of some of these past events. We have a right to use those because we're not barred by a statute of limitations. It's a different standard. There's a contractual limitation, but otherwise we get to use them. And we have to make our case, or we'd be buried for not looking at everything, including commendations and good stuff. You know, that's really why you go back and look. You have to look for the good stuff, too, and we did, in the record of commendations that were in our record. We didn't take those out. Facts have been misconstrued. There have been leaps of faith and leaps of credibility determinations that are bizarre. He finds we acted properly.  Okay. Anything else? You don't have to accept his errors of law. He says Panakowski failed to demonstrate that Pace's termination was motivated in whole or in part by unanimous. He said, Judge Clifford, there is no evidence that any disparity of treatment as to complaints reflects a pattern based on protected, union, or concerted activity. Either one. And that's just not there. One. It's just not there, gentlemen. So I ask you to reverse this. Thank you. Thank you very much for the arguments and the briefs. This case, this court is adjourned. This case is taken under advisory. Court is adjourned.